UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Sid Brooks

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No. |
| LAURRELLE J. CRAWFORD | ) | 11-24158-SBB |
| | ) | (Chapter 13) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**APPEARANCES:**

Larry M. Snyder, Esq.  
3300 E. 1st Ave, Suite 690  
Denver, CO 80206-5809  
COUNSEL FOR DEBTOR

Susan J. Hendrick, Esq.  
Aronowitz & Mecklenburg, LLP  
1199 Bannock Street  
Denver, CO 80204  
COUNSEL FOR JPMORGAN  
CHASE BANK, NATIONAL  
ASSOCIATION

**MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court at a hearing held January 11 and 12, 2012, on Debtor Laurrelle J. Crawford's Chapter 13 Plan of Reorganization filed June 14, 2011 (Docket #8) and the Objection thereto filed by JPMorgan Chase Bank, National Association ("Chase") filed July 20, 2011 (Docket #18), and on the Motion for Relief from Automatic Stay filed by Chase on November 28, 2011 (Docket #43) and Debtor's Responses thereto filed December 21, 2011 (Docket #48 and #50).

**I.     STATEMENT OF ISSUE**

The central question in this case is whether a Chapter 13 plan is confirmable where (a) the plan provides for payment in full of a first-mortgage lienholder upon sale of real property in which a debtor has substantial equity, but (b) where the debtor fails to provide for regular payments during the life of the plan. Put another way, may a debtor's plan be confirmed where the debtor makes no regular payments through the plan, but, instead, makes payment, in full, to all creditors – secured an unsecured – upon sale of her real property under the plan, which property is valued far in excess of all creditors' claims – secured and unsecured.

Chase asserts that Debtor is required by 11 U.S.C. § 1322(b)(5) to make payments through the duration of the Chapter 13 plan and that Debtor's failure to include a provision for such payments is an impermissible modification that renders her plan unconfirmable. Debtor disputes that failure to make monthly plan payments is fatal, arguing that, because she has substantial equity in the property, she is permitted to defer payment of Chase's claim, including

arrearages, interest, and costs, until the property is sold pursuant to 11 U.S.C. § 1322(b)(8).

## II.     BACKGROUND

Debtor is the owner of certain real property known by street number 28750 RCR 14A, Steamboat Springs, Colorado, 80847 ("Farm Property"). Debtor paid $1,360,000 in cash for the Farm Property in July 2007. She built a barn and began remodeling the home on the Farm Property sometime shortly thereafter.[1] At the time she purchased the Farm Property, Debtor also owned a 9,000-square foot house ("Guest House") in the City of Steamboat Springs, which she operated as a rental vacation property. Debtor testified she was grossing $115,000 a year from rental of the Guest House.

Sometime in 2005, a dispute arose between Debtor and the City regarding the legality of her renting the Guest House as a vacation home. According to Debtor, she went through two years of litigation with the City, through which it was determined that, in renting the property, Debtor was in legal compliance with the relevant ordinances. After this, however, the City Council enacted an ordinance that prohibited Debtor's continued operation of the Guest House as a vacation rental.

In 2007, without rental income, Debtor did not have the funds she needed to make the mortgage payments on the Guest House. Accordingly, Debtor listed the Guest House for sale, believing it would take only a short time to sell it, and took out a $417,000 mortgage on the Farm Property. On November 2, 2007, she executed a promissory note ("Note") secured by a deed of trust ("Deed of Trust") encumbering the Farm Property in the amount of $417,000 for the benefit of Washington Mutual Bank, FA ("WAMU"). The Deed of Trust was recorded in the official records of Routt County, Colorado, on November 15, 2007.

Debtor testified that for some time, she made payments on the Guest House mortgage using the funds she had borrowed from WAMU. However, the recession hit, and she was unable to sell the Guest House before exhausting the funds. Debtor ultimately lost the Guest House to foreclosure.

---

[1] Debtor's Exhibit 5, the listing for the Farm Property, states that the house was remodeled in 2009. It also states that the barn was built in 2009. Debtor testified credibly that this "must be a typo" because the dates were incorrect – both events occurred in 2007.

In 2008, Debtor talked with WAMU/Chase about modifying the loan on the Farm Property.[2] Debtor testified that, following that conversation, she understood her loan had to be in default for three months in order to be considered for a loan modification. She defaulted, as told, and then filed an application for modification with Chase/WAMU, submitting all requested documents.

Though Debtor had sufficient funds to make payments for six to eight more months at the time she defaulted, she testified credibly that she defaulted so she could be eligible for a loan modification.[3] Debtor testified that she and Chase/WAMU went back and forth for several months, during which time Chase/WAMU requested additional documents. Thereafter, during one of Debtor's conversations with a Chase/WAMU representative, Debtor learned she had been approved for a trial payment program. Debtor testified she understood that, if she made the payments for three months, in full and on time, she would be eligible for a permanent loan modification. Debtor stated that she waited for a letter confirming her eligibility for the program, but it never arrived. After some time, Debtor called Chase/WAMU to inquire about the loan, and she then learned the trial period had been withdrawn because WAMU "pulled the loan."

At some point in 2009, Chase/WAMU commenced foreclosing on the mortgage. A few days before the foreclosure sale, Debtor cured the arrearages, which were in excess of $32,000, using funds from her IRA..[4] Knowing she could not afford to make mortgage payments, Debtor immediately reapplied for mortgage modification. She also put the Farm Property up for sale, and attempted to make partial payments on the mortgage.[5] During this time, Debtor was also working to earn a certificate to be a professional home stager so she could increase her monthly earnings.

Debtor testified that in the process of applying for loan modification, she was asked to re-

---

[2] According to the Affidavit of Robert C. Schoppe, Receiver in Charge for the Federal Deposit Insurance Corporation as Receiver of Washington Mutual Bank, Chase acquired certain of the assets of WAMU, including all loans and loan commitments of WAMU on September 25, 2008, thereby becoming owner of the loan and loan commitments by operation of law. (Mot. Relief from Auto. Stay, Ex. 5 at 2 ¶ 4.) Debtor dealt with both WAMU and Chase.

[3] Debtor testified that the default occurred approximately a year after she executed the mortgage and deed of trust on the Farm Property.

[4] In Exhibit B to Corrected Debtor's Response to Motion to Relief from Automatic Stay (Docket #50), Debtor attests that on January 22, 2009, the Routt Conty Public Trustee filed a notice setting sale of the Farm Property for September 9, 2009 and that Debtor cured the default on or about August 18, 2009. (Ex. B to Corrected Debtor's Response ¶¶ 4, 12.) The Court notes that the exact dates of the foregoing events were not in evidence at trial, however.

[5] By this point, Debtor testified, her income had been drastically reduced, and she could not afford to make full monthly payments on the mortgage. Debtor testified that a Chase/WAMU representative told her that if she could not pay the full amount due each month, though, she should not make payments.

submit documents that she had already provided a number of times. Debtor's Exhibit 11 is a compilation of many – but not all – of the documents Debtor saved that pertain to her efforts to get modifications. It includes correspondence between Debtor and Chase/WAMU, documents forwarded to Chase/WAMU by Debtor, and Debtor's handwritten notes regarding the process. Exhibit 11, along with Debtor's testimony, is strong and persuasive evidence that Debtor did, in fact, submit a number of documents to Chase/WAMU, including documents already submitted. It also shows that Chase/WAMU, on a number of occasions, wrote to Debtor inviting her, again, to apply for its loan modification program – even as already-submitted loan modification applications were pending.[6] Debtor's uncontroverted testimony, coupled with Exhibit 11, which consists of many documents and transmittals between Debtor and Chase/WAMU, provides a trove of evidence that the creditor was confused, disorganized, inconsistent, and contradictory, and, at times, nonsensical in its loan modification program procedures with respect to the Debtor.

Exhibit 11 is also evidence that Debtor worked in good faith[7] to provide all documentation and necessary information that Chase/WAMU required in order to move forward with the loan modification process.[8]

After Debtor's modification was finally denied and she realized the Farm Property had to be sold, she worked diligently to sell it at top dollar. Starting in July 2011, through the fall,

---

[6] *See*, *e.g.*, Ex. 11 at 13 (Aug. 13, 2009 letter from Chase requesting additional documents, which Debtor testified she then submitted); Ex. 11 at 12 (Sept. 9, 2009 letter, in which Debtor advises WAMU that she is resubmitting documents already submitted); Ex. 11 at 42 (Oct. 29, 2009 letter, in which Chase invites Debtor to call to find out whether her home loan is eligible for a loan modification program); Ex. 11 at 44 (Nov. 30, 2009 letter, identical to Oct. 29, 2009 letter at page 42 of Exhibit 11); Ex. 11 at 45 (Dec. 3, 2009 letter from Debtor to Chase, forwarding pay checks and electric bill); Ex. 11 at 54 (Jan. 25, 2010 letter, identical to Oct. 29, 2009 and Nov. 30, 2009 letters from Chase at pages 42 and 44 of Exhibit 11).; Ex. 11 at 61 (Jun. 23, 2010 letter from Chase to Debtor in which Chase states, "Approximately two weeks ago, we sent you a package of information to complete and return so we can move forward with your application, but we haven't heard from you." The letter is entitled "Final Notice" and states, "Your Request for Loan Modification May be Cancelled." Debtor testified she had already applied a number of times and had already supplied the required paperwork a number of times.)

[7] In addition to trying to work directly with Chase/WAMU, Debtor tried to work with Housing Education Program, a nonprofit HUD-approved housing counseling agency, to aid in the modification process. Debtor testified that after she had advised her counselor there she was in the midst of a loan modification with Chase/WAMU, nothing more happened, and she continued with the Chase/WAMU modification process.

[8] Chase's counsel argued that Debtor's submission of multiple applications does not, in fact, evidence good faith because Debtor lacked the income required to qualify for loan modification. The Court does not find this argument persuasive, for it assumes that Debtor was familiar with Home Affordable Modification Program guidelines at the time she was applying, and that she knew that she stood no chance of qualifying for the program. This is an unreasonable assumption to make regarding most modification applicants, and is an particularly unreasonable assumption to make regarding this Debtor, who more reasonably would have understood that she probably *did qualify* for modification. After all, Chase continued to send Debtor notices about potentially modifying her loan even after it had received the numerous documents Debtor had sent in support of her prior applications, including documentation of her income and letters explaining her financial circumstances.

Debtor spent more than $4,400 to ready the Farm Property for sale,[9] putting windows in the barn and staining it, painting the trim on the house, repairing the boiler, and maintaining the hot tub. Beyond that, Debtor and her son spent considerable time repairing fencing, clearing trees and brush, and running barbed wire throughout the 50-acre property. Debtor testified, credibly, that she undertook these repairs to make the house presentable for potential buyers, as she did not want buyers to view the property with decks that looked unstained and worn. According to Debtor, her goal was to present the property in such a manner that it would sell quickly, and for a good price. The Property has been listed for sale since July 2011.

Chase filed a second foreclosure action on the Farm Property in 2010, and a foreclosure sale was set to occur; however, the sale was stayed by operation of 11 U.S.C. § 362 when Debtor filed for bankruptcy on June 14, 2011.

Debtor stated that it is her intention to sell the Farm Property as soon as possible. Debtor's real estate agent, Mike Shuttleworth, testified that the Debtor and he are actively marketing the property, and Debtor is working with him in this regard. So far, there have been five showings of the Farm Property, and there is some ongoing interest from one buyer, who is in the process of qualifying for a loan.

At present, the Farm Property is listed for $1,499,000, based on Mr. Shuttleworth's review of comparable properties. Mr. Shuttleworth acknowledged, however, that the average price of comparable properties[10] is lower – perhaps as low as $1,150,000 – and that a downward adjustment in price in the spring, the beginning of peak sales season in Steamboat, might well be necessary to sell the Farm Property. Debtor testified that she would rely on Mr. Shuttleworth's professionalism in making the decision about whether to adjust the price, and that she would continue to work with him to sell the Farm Property quickly. Throughout the sales process, Debtor has cooperated with Mr. Shuttleworth to make sure the house is clean and presentable for showings.

According to Chase, Debtor owes presently owes approximately $480,000 on the Note, including late fees, attorney fees, more than $67,000 in pre-petition arrearages, and more than $14,000 in post-petition arrearages. Debtor has not made any post-petition payments on the mortgage.

Debtor works part-time as a hostess at a restaurant at the ski resort in Steamboat and cleans a home for two-hours per week. In addition, Debtor is certified as a home stager and is trying to start a business that allows her to work in that capacity. According to her Schedule I, she has average monthly income of $1,803 and, according to Schedule J, expenses of $1,753 per month.

---

[9] *See* Debtor's Ex. 6 (checks and handwritten list reflecting Debtor's expenditures).

[10] Mr. Shuttleworth acknowledged that properties not in foreclosure – like the Farm Property – would have higher value than a property in foreclosure.

The most significant asset listed in Debtor's Schedules is the Farm Property, which values at $1.2 million in Schedule A. Though the exact value of the Farm Property has yet to be determined, the parties have stipulated that Debtor has no less than $400,000 and no more than $1.0 million in equity in the property.[9] Bottom line: Chase/WAMU's claim of $480,000 is over secured by collateral worth between an estimated $850,000 and $1,200,000.

Debtor has little debt beyond the $417,000 owed to Chase, which she identifies as a secured claim on Schedule D. She identifies an unsecured priority claim for taxes owed to Routt County, Colorado, in the amount of $2,152.66 in Schedule E, and a total of $5,605.98 in unsecured nonpriority claims in Schedule F.

## III. DISCUSSION

In her original Chapter 13 Plan, filed June 14, 2011 (Docket #8) ("Original Plan"), Debtor proposed to "sell her home with equity of approximately $700,000.00." Debtor explained, "This sum shall pay all of the unsecured creditors."[10] On August 8, 2011, pre-confirmation, Debtor filed an Amended Chapter 13 Plan (Docket #26) ("Amended Plan") in which she proposes curing all arrearages and paying all other amounts owed to Chase upon sale of the Farm Property. Debtor also proposes making monthly payments of $150 over an applicable commitment period of 36 months, through which all unsecured creditors would be paid in full. In regard to payment of Chase, the Amended Plan provides:

> Debtor has employed a professional real estate agent, for the purpose of selling her real property. Upon the sale of real property, the Debtor will turn over sufficient funds to pay the allowed unsecured claims and priority claims. The secured claim of JP Morgan Chase Bank ("Case") shall be paid from the proceeds of the sale at the time of closing. Neither the trustee or the Debtor shall make any interim payments to Chase until the sale of the property. There is an estimated $900,000.00 equity cushion in the subject matter property. Therefore, the real property has [sic] sufficient equity cushion to fund any indreasing [sic] arrearages, costs, as well as the principal balance. . . . No payment shall be made on Chase's claims until sale of the property. The sale of real property and related fees and costs shall be subject to the approval of the Bankruptcy Court. The Debtor shall actively market the property, sale of the property shall not occur without prior authorization of the Bankruptcy court and notice to the [sic] JP Chase and Trustee, and the Trustee shall be given an

---

[9] In her Schedule D, Debtor identifies Chase's secured claim in the amount of $417,000. Debtor does not dispute that, pursuant to the terms of the Note, she owes the additional amounts claimed by Chase.

[10] Original Plan (Docket #8) at 5 § III.A.3.

opportunity to participate in the closing of the sale.[12]

Chase filed an Objection to the Original Plan on July 20, 2011 (Docket #18), in which it contends that the Original Plan cannot be confirmed because it does not purport to cure pre-petition arrearages nor to provide for payment of amounts due to Chase post-petition, as required by the Note and Deed of Trust.[13] According to Chase, the Plan violates the non-modification provision of 11 U.S.C. § 1322(b)(5).[14]

Chase also asserts that Debtor's bankruptcy was filed in a bad-faith attempt to frustrate the foreclosure sale. Further, according to Chase, Debtor has not acted in good faith in trying to sell the home because her efforts have come too late and are not genuinely geared at selling the house. Chase opines that, by pricing the house too high, by waiting until July 2011 to the put the Farm Property on the market, and by proposing to live at the Farm Property until it has sold, Debtor has exhibited an intent to delay sale and to "live in the house for free" for as long as possible. For these reasons, Chase argues it should be granted relief from stay and Debtor's Plan should not be confirmed.

For her part, Debtor disputes that Chase has standing to seek relief from stay or to object to confirmation of the Plan. Debtor further disputes that she has acted in other than good faith, arguing she made honest efforts to work with Chase/WAMU in the loan modification process and, after modification was denied, to sell the Farm Property. Debtor also contends that the significant equity cushion provides Chase with adequate protection from loss. Further, Debtor argues, because of the significant equity in this property, she is permitted to partially fund her Plan through the sale of her property pursuant to 11 U.S.C. § 1322(b)(8).

**A. Standing**

Debtor has raised the question of standing, contending that Freddie Mac is the owner of the Note and, therefore, the only party with standing.

Chase disputes this, arguing that it has standing because it is holder of the original Note. Additionally, Chase contends, because Debtor failed to challenge Chase's standing at the state-court foreclosure proceeding, Debtor is precluded from challenging its status as a party in interest in this Court under the *Rooker-Feldman* doctrine.

---

[12] Amended Plan (Docket #26) at 5 § III.A.3.

[13] The Chapter 13 Trustee also filed an "Objection to Motion to Confirm Chapter 13 Plan" on July 21, 2011 (Docket #19). At the beginning of trial, counsel for the Trustee advised that the Trustee did not object to the Amended Plan.

[14] Though Chase's Objection was filed in regard to the Original Plan, Chase's argument at the trial held January 11 and 12, 2011 was directed at the Amended Plan, as were its Proposed Findings of Fact (Docket #70). Accordingly, the Court will rule on the Objection as though it were filed as an Objection to the Amended Plan.

> The Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay" if the party in interest has made the appropriate showing to obtain such relief. 11 U.S.C. § 362(d). The Bankruptcy Code does not define the term "party in interest" for purposes of this subsection. Courts have concluded, however, that in order to invoke the court's power to award relief under § 362(d), a party must be either a creditor or a debtor of the bankruptcy estate.[15]

The question before the Court, then, is whether Chase has established its status as a creditor of Debtor.

At trial, Chase produced the original, indorsed, note, which Debtor acknowledged was authentic.[16] The Court agrees that Chase has established its standing to enforce the note by virtue of its possession of the original note.[17]

### B. Motion for Relief from Automatic Stay

"The automatic stay generally prohibits ... litigation, enforcement of liens, and other actions, be they judicial or otherwise, which would affect or interfere with property of the estate, of the debtor, or which is in the custody of the estate."[18] "The stay procedure allows the bankruptcy court 'to retain control over the resolution of all claims pertaining to the debtor and the bankruptcy estate.'"[19]

---

[15] *Miller v. Deutsche Bank Nat'l Tr. Co. (In re Miller),* 666 F.3d 1255, 1260-61 (10th Cir. 2012)(citations omitted).

[16] Indeed, the Court recessed the proceedings to allow Debtor's handwriting expert to examine the note prior to Debtor's making this concession.

[17] *Miller*, 666 F.3d at 1262-64 (stating requirements to establish status as holder and transferree of note, and therefore as creditor with standing to seek relief from stay). In light of this conclusion, the Court need not address Chase's secondary argument. However, the Court notes that in *Miller*, the Tenth Circuit concluded that attempts to relitigate an issue determined by a state court "are properly analyzed under issue or claim preclusion principles rather than *Rooker-Feldman*." *Id.* at 1261. The Court went on to conclude that foreclosure proceedings conducted pursuant to Rule 120 of the Colorado Rules of Civil Procedure do not have preclusive effect. *Id.* at 1262.

[18] *In re Jim's Maintenance & Sons, Inc.*, 418 Fed. Appx. 726, 728 (10th Cir. 2011)(unpublished decision)(citing *Pursifull v. Eakin*, 814 F.2d 1501, 1504 (10th Cir.1987)(citing 11 U.S.C. § 362(a)).

[19] *Id.* (citing *Pursifull*, 814 F.3d at 1504).

11 U.S.C. § 362(d)(1)[20] provides, in relevant part, that a bankruptcy court shall grant relief from the automatic stay:

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>> (A) the debtor does not have an equity in such property; and
>> (B) such property is not necessary to an effective reorganization; [or]
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—
>> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time . . . .[21]

In other words, "[r]elief from the automatic stay may be granted for cause, *see* 11 U.S.C. § 362(d)(1), which involves a discretionary determination by the bankruptcy court made on a case by case basis."[22] In making this determination, a bankruptcy court is given wide latitude to consider relevant information and to balance the equities.[23] "The moving party has the burden to show that 'cause' exists to lift the stay, after which the burden shifts to a debtor to demonstrate

---

[20] Chase's Motion for Relief from Automatic Stay indicates that relief is sought pursuant to 11 U.S.C. § 362(d). Further, in paragraph 12 of the Motion, Chase states that it moves for termination of the stay pursuant to 11 U.S.C. § 362 (3) and (4). At the hearing, Chase made arguments regarding a lack of adequate protection, Debtor's lack of good faith, and the improbability of Debtor's Plan being confirmable. Accordingly, the Court presumes that Chase intended to proceed under § 362(d)(1). It is clear, in any event, that subsection (d)(2) does not apply, because Debtor has equity in the property, that subsection (d)(3) does not apply, because this is not a single-asset real estate case, and that subsection (d)(4) does not apply, because there is no allegation or evidence that Debtor transferred all or part ownership of the Farm Property, or that Debtor has filed for bankruptcy multiple times in an effort to hinder her creditors.

[21] 11. U.S.C. § 362(d).

[22] *Jim's Maintenance*, 418 Fed. Appx. at 728 (citing *Busch*, 204 B.R. at 140).

[23] *In re Myers*, 491 F.3d 120, 130 (3d Cir. 2007).

why the stay should remain in place."[24]

### 1. Adequate Protection

Chase contends it is not adequately protected from risk because of the potential loss of value of the Farm Property while Debtor attempts to sell it. The Court does not find this argument persuasive. In this case, the equity cushion of, at minimum, $400,000, adequately protects Chase.[25] Indeed, even were Debtor to rack up 60 months of unpaid arrearages, assuming a $3,000 payment per month (which the Court assumes would provide for payment of principal, interest, taxes, and insurance),[26] Chase would still be protected by a substantial equity cushion.

Further, there is no evidence that while Debtor holds the Farm Property its value could deteriorate to a point where Chase would be at risk. Rather, Debtor's testimony shows that she has made reasonable efforts to maintain the Farm Property and, indeed, to improve it so that it will sell at the highest possible value. Debtor has maintained insurance on the Farm Property, thereby minimizing Chase's risk in the event of accidental damage. Chase has failed to establish risk substantial enough to justify lifting the stay.

### 2. Balancing the Equities

Though not explicitly argued at trial, Chase has also suggested that it should be permitted to foreclose on the Farm Property, or that the case should be converted to Chapter 7 (so that a trustee can more aggressively market the Farm Property), because payment of its claim will be delayed by allowing Debtor to sell the Farm Property herself. However, the balance of the equities does not support granting relief from stay.

"The Bankruptcy Code's ultimate goal is to balance the equities and interests of all affected parties involved in a bankruptcy case."[27] As the testimony at trial demonstrated, a property sold through foreclosure is likely to sell at a lower price than a comparable property not in foreclosure. Such sale would not affect the value of a lienholder's claim, which is fixed by the terms of the note and deed of trust, but it would affect the debtor's bottom line adversely by forcing sale at a lower price than debtor could receive outside of foreclosure Granting relief from stay would unfairly elevate Chase's interest in receiving payment promptly over Debtor's interest in receiving the maximum amount possible from sale of the Farm Property. Such

---

[24] *Jim's Maintenance*, 418 Fed. Appx. at 728 (citing *Busch*, 294 B.R. at 140-41).

[25] *See*, *e.g.*, *In re Sarafoglou*, 345 B.R. 19, 25 (Bankr. D. Mass. 2006)(finding creditor failed to show cause for relief from stay where it had a $485,048 secured claim on a $900,000 residence because creditor was "more than adequately protected").

[26] In Chase's Motion for Relief from Automatic Stay, it indicates that payments are around $2,883 per month. (Motion ¶ 9.)

[27] *ANR, Ltd. Inc. v. Chattin*, 89 B.R. 898, 903 (D. Utah 1988)(citation omitted).

inequitable result would be contrary to the purpose of the Code.

Chase has not met its burden to show cause exists to lift the stay.

### C. Confirmation of Plan

"A bankruptcy court must confirm a Chapter 13 plan if the plan meets each of the six requirements set forth in § 1325(a) and the debtor proposes payments which meet the requirements of § 1325(b)."[28] Section 1325(a)(1) permits confirmation only if the plan is consistent with the rest of the Code.[29] Further, the debtor has the burden of proving that a plan is confirmable.[30]

According to Chase, Debtor's Amended Plan is not consistent with 11 U.S.C. § 1322(b)(2) because it modifies the terms of the Note and Deed of Trust. Further, Chase asserts that the Amended Plan is not consistent with 11 U.S.C. § 1322(b)(5) because it does not require Debtor to make regular monthly payments to Chase, as required by the Note. Because Debtor's income is insufficient to allow her to cure pre-petition arrearages and make the post-petition monthly payments owed under the terms of the Note and Deed of Trust, Chase argues, the Amended Plan is not feasible. At trial, Chase also objected that the Amended Plan is not proposed in good faith.

#### 1. Confirmability of Sale Plans that Do Not Provide for the Cure of Arrearages or Regular Mortgage Payments During the Plan

11 U.S.C. § 1322(b)(2) "provides that Chapter 13 filers may not 'modify the rights of holders of secured claims' that are 'secured only by a security interest in real property that is the debtor's principal residence.'"[31] "Notwithstanding the limitation of 11 U.S.C. § 1322(b)(2), 11 U.S.C. § 1322(b)(5) allows a debtor to 'provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending . . . .'"[32] Chase interprets these two provisions as requiring a debtor to make regular monthly payments and cure arrearages owed

---

[28] *Mason v. Young (In re Young)*, 237 B.R. 791, 797 (10th Cir. BAP 1999).

[29] *In re Mersmann*, 505 F.3d 1033, 1048 (10th Cir. 2007) (en banc), *abrogated on other grounds by United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367 (2010).

[30] *In re Lincoln*, 30 B.R. 905, 909 (Bankr. D. Colo. 1983).

[31] *Dewsnup v. Timm*, 502 U.S. 410, 429 (1992)(quoting section 1322(b)(2))(emphasis omitted).

[32] *In re Valdez*, Case No. 13-06-12431 MA, 2007 WL 1464439 *2 (Bankr. D.N.M. May 17, 2007) (quoting 11 U.S.C. § 1325(b)(5)).

during the course of a chapter 13 plan,[33] even in cases where a debtor exercises her right under section 1322(b)(8) to provide for payment of amounts owed to holder of a secured claim through sale of the secured property.

This Court agrees with the bankruptcy Court in *In re Erickson* that Section 1322(b)(8), "appearing as it does directly after [section] 1322(b)(2) and (b)(5), clarifies that a sale plan is not contrary to the limitations and modifications of mortgages addresses elsewhere in [section] 1322(b)."[34] Further, the Court agrees that Chapter 13 plans that provide for a sale of property to cure arrearages and provide for the payment of principal, interest, and any other amounts due under a note or deed of trust "do not *per se* modify secured creditors' rights; they merely delay immediate payment to creditors in consideration for what is often accelerated full payment."[35] Though debtors certainly have the option of providing for regular payments in chapter 13 plans, they are not required to do so under 1322(b)(5), which is permissive rather than mandatory.[27] Where a debtor has ample resources to pay a claim, but those resources are tied up in a real property encumbered by a creditor's security interest – as is the case here – section 1322(b)(8) allows a court to confirm a plan in which the debtor proposes to pay off that claim within a reasonable amount of time through the sale of the real property. Accordingly, there is nothing improper about this Debtor's proposed deferral of payment to Chase until sale occurs.

2. <u>Feasibility of Debtor's Plan</u>

Chase objects to Debtor's plan, arguing that it cannot be confirmed because it cannot meet the feasibility requirement set forth in 11 U.S.C. § 1325(a)(6).[28] Indeed, "in denying confirmation of a debtor's plan which proposes to pay secured creditors through a sale of property, many courts . . . focus on the feasibility requirement . . . ."[29] In evaluating the feasibility of sale plans, those courts have considered evidence related to (a) the amount of the

---

[33]    There are a number of Courts that have agreed with Chase's interpretation. The Ninth Circuit Bankruptcy Appellate Panel, for example, held that not requiring a debtor to pay current installments "creates rather than cures a default." *In re Gavia*, 24 B.R. 573, 575 (9th Cir. BAP 1982)(per curiam). *See also In re Proudfoot*, 144 B.R. 876, 877-78 (9th Cir. BAP 1992)(per curiam) (reversing bankruptcy court's order approving modified Chapter 13 plan and denying motion to dismiss where plan made no provision for making regular future mortgage payments as they became due and provided for payment of creditor through sale of property). Similarly, Judge Kishel of the U.S. Bankruptcy Court for the District of Minnesota held, "[A]ny proposal to toll a debtor's obligation of periodic debt service works a modification of the mortgagee's contractual rights in violation of § 1322(b)(2), whether the tolling is indefinite or for a fixed term." *In re Newton*, 161 B.R. 207, 217 (Bankr. D. Minn. 1993).

[34]    *In re Erickson*, 176 B.R. 753, 757 (Bankr. E.D. Pa. 1995).

[35]    *Id.*

[27]    *Powell v. Illinois (In re Powell)*, 29 B.R. 346, 349 (Bankr. D. Colo. 1983).

[28]    11 U.S.C. § 1325(a)(6) provides that a court shall confirm a plan if "the debtor will be able to make all payments under the plan and to comply with the plan."

[29]    *Valdez*, 2007 WL 1464439 at * 3 (citing numerous examples).

creditor's claim; (b) the state of the market for the subject asset; (c) current sale prospects; (d) the existence and maintenance of any equity cushion; (e) the terms of the debtor's listing agreement, including the listing price for the subject asset and plans for marketing it; and (f) whether or not the plan includes a default or "drop dead" remedy either to relieve the mortgagee from the
automatic stay or to convert the case to another chapter if the sale does not close by the end of the proposed cure period.[30]

      a.  *Amount of Chase's Claim and Equity Cushion*

  In the instant case, the parties have stipulated that, taking into account Chase's claim of approximately $480,000, Debtor has between $400,000 and $1 million in equity in the Farm Property.

      b.  *State of the Market and Current Sales Prospects*

  At trial, Mr. Shuttleworth stated that there had been five showings of the Farm Property. He also testified that there is prospective buyer who has shown ongoing interest in the Farm Property, and that the buyer is in the process of trying to qualify for a loan. There was no testimony as to the likelihood of this prospective buyer's qualifying for the loan and/or making an offer on the Farm Property.

  The evidence at trial also indicated that properties comparable to the Farm Property have sold for considerably less than the current listing price of the Farm Property. Indeed, the summary report provided by Mr. Shuttleworth indicates that the average price at which comparable properties have sold is $1,158,333. The report also indicates that those properties sold not long ago – in October and December 2011.[31]

---

[30]  *See*, *e.g.*, *In re Mastel*, Case No. 09-60784-13, 2010 WL 234971 * 5-6 (Bankr. D. Mont. Jan. 15, 2010) (listing considerations); *Erickson*, 176 B.R. at 756-57 (listing possible considerations and citing considerations listed by court in *In re Newton*, 161 B.R. at 217-18, as well taken).

[31]  Debtor's Ex. 2.

        c.     *Terms of Debtor's Listing Agreement and Plans for Marketing the Farm Property*

Debtor's listing agreement with Mr. Shuttleworth provides that the Farm Property will be listed for $1,499,000 and that Mr. Shuttleworth's firm will receive a 6% commission upon sale of the Farm Property to a third party or a 5% commission in the event that Mr. Shuttleworth represents both the purchaser and Debtor.[32] Debtor testified that if Mr. Shuttleworth advises her that it is necessary to adjust the price of the Farm Property downward to sell it, she would be willing to adjust the price accordingly. Mr. Shuttleworth testified that he would evaluate pricing in the spring, but that a downward adjustment in price might be merited at that time.

        d.     *Default Provision*

Debtor's Amended Plan includes no default remedy that addresses the possibility that Debtor might not be able to sell the Farm Property within a reasonable time. When asked about this, Debtor's counsel indicated that if the Farm Property were not sold within the plan period, Debtor would seek modification of the Amended Plan.

        e.     *Discussion*

Though Debtor's Amended Plan does, in fact, allow her to remain in the Farm Property for thirty-four months without payment,[33] Chase's argument that Debtor seeks to "live for free" in the Farm Property is not well taken. First, the longer Debtor remains in the Farm Property without selling it, the more her equity cushion diminishes. For that reason, Debtor has every incentive to sell the Farm Property as quickly as possible. Second, Debtor has put both cash and sweat equity into maintaining the Farm Property, and her testimony is very credible that she did so in an effort to sell the Farm Property as quickly as possible. There is no evidence that Debtor is dragging her feet to avoid selling. Third, Chase's interest in the Farm Property is not at risk while Debtor remains there. To the contrary, Chase is more than adequately protected by Debtor's equity cushion, which is unlikely to diminish substantially given Debtor's efforts at maintaining the Farm Property.

Further, though Mr. Shuttleworth testified at trial that he could not guarantee the Farm Property would sell within three years, it seems more likely than not that Debtor will be able to sell the Farm Property during that time. Indeed, the evidence indicates that, even in this real estate market, properties like Debtors have been selling. Moreover, Debtor's testimony and the other evidence introduced at trial indicate that the property has been well-maintained and cared for, and that Debtor is willing to take necessary steps to ensure that it sells within a reasonable amount of time.

---

[32]    Debtor's Ex. 12.

[33]    The Plan provides for a 34-month plan period, beginning July 14, 2011. (Am. Plan § III.A.1.)

However, Chase's argument that the Plan fails to provide for any remedy in the event the Farm Property cannot be sold within a reasonable amount of time *is* well-taken. Though the Court concludes that Debtor's substantial equity in the Farm Property provides great protection to Chase, the Court also finds that it would not be fair to require Chase to wait indefinitely without payment on its Note and Deed of Trust while Debtor attempts to sell. Accordingly, the Court concludes that in order for Debtor's Amended Plan to be confirmed, it must include a default provision that addresses the possibility that Debtor may not be able to sell the Farm Property within a reasonable period of time.

Taking all of the above into account, the Court finds that Debtor's Amended Plan is close to ready for confirmation. However, before the Plan can be confirmed, Debtor needs to include a default provision that addresses what will happen if the Farm Property does not sell within the Plan period. Specifically, Debtor should include a provision allowing the Chapter 13 Trustee to liquidate her real estate through a court-approved process, or a provision requiring her to convert her case to Chapter 7 if the Farm Property does not sell within a specified time.[34]

## IV. CONCLUSION AND ORDER

For the reasons stated above, it is

ORDERED that the Motion for Relief from Automatic Stay filed by JP Morgan Chase Bank, National Association, on November 28, 2011, is DENIED. It is

FURTHER ORDERED that the Objection to Debtor Laurrelle J. Crawford's Chapter 13 Plan of Reorganization filed by JPMorgan Chase Bank, National Association on July 20, 2011, is

SUSTAINED in part and OVERRULED in part, as stated above. It is

FURTHER ORDERED that Debtor shall have fifteen (15) days in which to file a Second Amended Chapter 13 Plan that addresses the Court's concerns as stated above, failing which, the case will be dismissed without further notice..

Dated this 19th day of March, 2012.

BY THE COURT:

*[signature]*

Sidney B. Brooks,
United States Bankruptcy Judge

---

[34] *See Erickson*, 176 B.R. at 757 (discussing necessity of default remedy); *Mastel*, 2010 WL 234971 at *6-7 (discussing "drop dead" provision as important to ensuring that creditors see way out of case financially whole).